289 So.2d 367 (1973)
COLLECTOR OF REVENUE, State of Louisiana
v.
GULF STATES UTILITIES COMPANY.
No. 9588.
Court of Appeal of Louisiana, First Circuit.
December 17, 1973.
Rehearing Denied February 15, 1974.
Writ Refused April 11, 1974.
*368 Harold J. Brouillette, Marksville, for appellant.
Tom F. Phillips, Baton Rouge, for appellee.
Before LOTTINGER, BLANCHE and CRAIN, JJ.
BLANCHE, Judge.
This is a devolutive appeal by plaintiff in rule, Collector of Revenue, State of Louisiana (hereinafter referred to as "Collector"), from the judgment of the trial court dismissing plaintiff's rule against defendant in rule, Gulf States Utilities Company (hereinafter referred to as "Gulf States"), for a judgment for delinquent taxes, interest and attorney's fees. LSA-R.S. 47:1061 provides in part for the imposition of a two percent per annum tax upon manufacturers or generators of electricity upon the gross receipts from the sale of electricity so manufactured or generated in this state.[1] The Collector instituted this summary proceeding pursuant to the authority set forth in R.S. 47-1574,[2] *369 contending that the gross receipts of Gulf States for the fiscal years ending July 31, 1968, through July 31, 1972, were $7,523,890.20 more than actually reported, resulting in a tax delinquency in the principal amount of $150,477.80, together with interest as provided by R.S. 47:1601,[3] and attorney's fees as provided by R.S. 47:1512.[4]
In dismissing the rule filed by the Collector against Gulf States, the trial judge rendered written reasons, excerpts from which are reproduced below:
"* * * The basis for the Collector's contention is that Gulf States deducted from the amount due it by Humble Oil and Refining Company certain `credits' which he submits improperly reduced the actual gross receipts from the sale of electricity for purposes of the subject tax. * * *
"Gulf States sells steam and electricity to Humble-Enjay (now Exxon) under a contract which is filed in evidence as `Joint Exhibit E'. Basically Gulf States agreed to sell and deliver to Humble-Enjay and they in turn agreed to purchase and receive all the electric energy and steam generated and used by it, restricted however, to a specified maximum. The rates charged for steam and electricity are each determined by separate formulas. The formula for electricity is *370 found in Article IV, section 2 of the contract and which provides:
`Section 2Rates for Electric Energy
`For electric energy contracted for hereunder, Humble-Enjay shall pay Gulf States each contract month the following:
`(a) A Demand Charge computed on the basis of: First 125,000 KW of Billing Demand at $1.615 per KW.
Additional KW of Billing Demand at $1.4725 per KW.
`(b) A Quantity Energy Charge of $0.002755 per KWH delivered.
`(c) A Customer Facilities Charge of 1.25% per month on the sum of the investment by Gulf States in local substation facilities, if any, as provided for in Article V, Section 3(b)(2) of this contract.
`(d) Less a credit against the total of (a), (b) and (c) above for surplus and economy energy to be computed on the basis of $0.0787 times M lbs of steam delivered to Humble-Enjay during the contract month up to but not more than 1,584,100 M lbs steam; and, a credit of $5,833.33 each contract month for elimination of sludge deliveries.
`Provided however, the minimum charge for electric energy contracted hereunder for each contract month shall be a total of the demand charge provided in (a) above and the customer facilities charge provided in (c) above.'
"The conflict arises from the credits given in Paragraph (d) above for `surplus and economy energy' and `for elimination of sludge deliveries.' The Collector of Revenue contends that these credits represent additional goods and services paid instead of cash and that the gross receipts from the sale of electricity should be computed on the total before these credits are allowed. The Collector states, moreover, that these credits bear no relationship to the determination of the actual cost of the electricity. In fact, it is argued that the credit for `surplus and economy energy' is directly related to the production of steam and not electricity. This is indicated by the contract which provides that the credit is directly proportional to the amount of steam supplied to Humble-Enjay. It is argued that because steam is not taxed, the application of these credits to electricity rather than steam gives Gulf States an unfair tax advantage by improperly lowering their tax base. The Court feels, however, that the evidence submitted on the trial of the matter justifies a conclusion that what was shown as `credits' was merely the result of bargaining for an adjustment in rates rather than an attempt to avoid a tax on the energy sold.
"Testimony at the hearing indicated that Humble-Enjay supplies fuel to Gulf States under Article IV section 3 which is used entirely in creating steam which in turn is used in creating electricity. The utilization of the steam produced for Humble-Enjay in generating electricity for Humble-Enjay reduces Gulf States' cost of generating the electricity. This reduction in the cost of electricity is directly related to the amount of steam produced and is thus passed on to Humble-Enjay in the form of a credit. Viewed in this light, it is apparent that the credit was not representative of goods or services passing from Humble to Gulf States and was, therefore, properly applied to the rate for electricity.
"The `credit for elimination of sludge' was shown by the evidence to be a fictional credit. Apparently, in renegotiating their contract, Humble-Enjay indicated that it was dissatisfied with the cost of the electricity. Therefore, Gulf States acceded to a reduction in price of $70,000.00. In order to implement the price reduction a `credit for elimination of sludge' was applied to the previous amount. (See Exhibit D-3) The term `credit for elimination of sludge' had reference to a previous agreement whereby *371 Gulf States had agreed to use a certain inexpensive fuel called `sludge'. Although originally thought to be profitable, it later proved otherwise. Consequently, the practice was stopped. The testimony indicated that the application of the term to the rate reduction was merely contrived and a misnomer. It is therefore clear that no goods or services passed hands. It is submitted by Gulf States that both of these `credits' could have been provided for by merely reducing the demand charge. This, of course, is true since the rates in this case would not be controlled by the Louisiana Public Service Commission. But instead of reducing the demand charge, the reductions were merely set out as separate steps in the rate schedule. Gulf States contends that it is the final amount, after considering all steps in the schedule, that represents the true rate and thereby determines the gross receipts and in this contention, the Court is of the opinion that it is correct.
"Although the Collector of Revenue argues that the entire discrepancy arises from the reduction of the `credits' prior to reporting the gross receipts, another issue is also inferentially raised by the Collector. This concerns the delivery of fuel to Gulf States by Humble. (See Article IV Section 3). The argument is that this clearly represents the payment in goods instead of money and must be taxed as money. The Collector might, of course, be correct if Humble, in return for electricity and steam received, paid Gulf States in fuel. But that is not what happened. Instead, Humble supplied the fuel to Gulf States which is entirely used in the process of making steam and generating electricity for Humble. Gulf States does not use the fuel for any other purpose. An appropriate illustration on this point is found in Gulf States' brief and is quoted:
`* * * [C]onsider the economic result of a person deliverying [sic] a bolt of cloth to a tailor for the tailoring of a suit. The tailor charges the customer for his time and services and such charges constitute his receipts from the endeavor.'"
(Written Reasons for Judgment, Record, pp. 13, 16-19)
We agree with the trial judge's finding that the denominated "credit for elimination of sludge" was, indeed, merely a negotiated reduction in the rate which Gulf States would charge Humble Oil for electricity, and Gulf States properly overcame the prima facie case enjoyed by the Collector in this proceeding by virtue of R.S. 47:1574(4)[5] to the effect that this credit represented compensation to Gulf States for the fuel supplied by Humble Oil.
We do not agree with the trial judge's finding, however, that Gulf States satisfactorily overcame the prima facie case enjoyed by the Collector and negated the contention of the Collector that the "credit for surplus and economy energy" constitutes reimbursement by Gulf States to Humble for goods and services received by Gulf States, which should be included within the "gross receipts" of Gulf States and thus amenable to taxation.
As previously indicated, the trial judge found as a fact that the "credit for surplus and economy energy" was directly proportional to the amount of steam supplied to Humble-Enjay by Gulf States, which in turn is directly related to the amount of fuel supplied by Humble-Enjay to Gulf States "which is used entirely in creating steam which in turn is used in creating electricity. The utilization of the steam produced for Humble-Enjay in generating electricity for Humble-Enjay reduces Gulf States' cost of generating the electricity. This reduction in the cost of electricity is directly related to the amount of steam produced and is thus passed on to Humble-Enjay in the form of a credit." *372 (Written Reasons for Judgment, Record, p. 17Emphasis supplied) The trial judge reasoned, however, that inasmuch as this fuel was used entirely by Gulf States in the process of generating electricity solely for Humble, the value thereof should not be included in the "gross receipts" of Gulf States for purposes of computing the tax owed. The trial judge further reasoned that this situation was no different from "a person delivering a bolt of cloth to a tailor for the tailoring of a suit."
We cannot agree with this rationale. The tax imposed by R.S. 47:1061 is upon the "gross receipts from the sale of electricity so manufactured or generated," not upon the net profit. It is obvious, accordingly, that if Gulf States had to purchase fuel from another company in order to produce steam to generate electricity to be sold, the sales price of such electricity so generated, i.e., "the gross receipts," would include the expense incurred by Gulf States in obtaining the fuel, and the tax would be imposed upon the full consideration received by Gulf States ("gross receipts"), and not upon the net profit.
Amplifying the trial judge's "bolt of cloth to a tailor" illustration, it becomes readily apparent that if a suit manufacturer were subject to a tax on gross receipts derived from the sale of suits to retail stores, no difference in the tax liability should result from a situation where the suit manufacturer purchased the cloth necessary from another entity and then sold the manufactured suits to a retailer, and a situation where the retailer furnished the cloth to the suit manufacturer, and thus paid less in cash for the suits because of having furnished the cloth needed in their fabrication. If, for example, in the first instance the manufacturer sells a suit to a retailer at a gross price of $90, and the cloth used to fabricate the suit costs the manufacturer $40, and a two percent tax on the "gross receipts" exists, it is obvious that the manufacturer receives a net after-tax profit of $48.20 (deducting the $40 cost of the cloth plus the $1.80 tax liability two percent of the "gross receipts" of $90); whereas, in the second instance, if the retail customer furnishes the cloth so that the suit manufacturer receives only $50 cash representing the manufacturer's net profit before tax, the situation will be no different if the two percent tax is still imposed upon the $90 base (in which case the suit manufacturer will still receive the same net after-tax profit on the suit of $48.20), but the situation would be distorted if the two percent tax were imposed merely on the $50 base (in which case the taxing authority would obviously receive only one dollar in tax on the suit, with the net after-tax profit to the suit manufacturer being increased by eighty cents).
It becomes quite apparent that if this construction and application of the tax law were permitted, nothing would operate to prevent the customer furnishing as much of the raw materials and labor as possible, thus reducing the "cash price" paid by the customer for the object being taxed, which in turn would permit the manufacturer to mitigate the otherwise applicable tax liability and concomitantly increase the manufacturer's net profit. In the instant case, for example, Gulf States could agree to reduce further the "cash price" which Humble would be obligated to pay for the electricity furnished, provided Humble furnished not only the fuel required but also the labor force to operate the generators. Such would cost Humble no more than what it would otherwise be required to pay for the needed electricity, would further reduce the "tax base," and thus reduce the tax liability of Gulf States and at the same time directly and proportionately increase the net after-tax profit of Gulf States. This Court will not countenance such a construction and application of the tax statute in question.
The record[6] reflects that the improper "credit for surplus and economy power" for the fiscal years in question totals $7,115,557.02. The two percent tax thereon amounts to $142,311.14. Interest will be *373 owed on the respective principal amounts of unpaid taxes in accordance with the provision of R.S. 47:1601 on principal tax liability as that statute read for those taxes falling due prior to the effective date of the 1970 amendment thereto, and with interest due on those taxes which became due subsequent to the effective date of such amendment at the new interest rate. The Collector is further entitled to recover attorney's fees in the amount of ten percent on the aggregate of principal unpaid taxes and interest due thereon, together with all costs of these proceedings.
For the foregoing reasons, the judgment appealed from is reversed in part, and judgment is rendered in favor of the Collector of Revenue, State of Louisiana, and against defendant in rule, Gulf States Utilities Company, in the principal sum of $142,311.14, with interest thereon as indicated above, plus ten percent attorney's fees on the aggregate of principal and interest due, together with all costs of these proceedings.
Reversed in part and rendered.
NOTES
[1] R.S. 47:1061 reads, in pertinent part, as follows:

"A. Upon manufacturers or generators of electricity. In addition to all other taxes of every kind now imposed by law, every person engaged in the business of manufacturing or generating electricity for heat, light or power, in the state of Louisiana shall be subject to the payment of an excise, license or privilege tax of two per centum for each quarter of the calendar year of the gross receipts from the sale of electricity so manufactured or generated in this state, except the receipts from that portion of electricity sold to any person for distribution and resale."
[2] R.S. 47:1574 reads, in its entirety, as follows:

"In addition to any other procedure provided in this Sub-title or elsewhere in the laws of this state; and for the purpose of facilitating and expediting the determination and trial of all claims for taxes, penalties, interest, attorney fees, or other costs and charges arising under this Sub-title, there is hereby provided a summary proceeding for the hearing and determination of all claims by or on behalf of the state, or by or on behalf of the collector, for taxes, excises, and licenses and for the penalties, interest, attorney fees, costs or other charges due thereon, by preference in all courts, all as follows:
"(1) All such proceedings, whether original or by intervention or third opposition, or otherwise, brought by or on behalf of the state, or by or on behalf of the collector, for the determination or collection of any tax, excise, license, interest, penalty, attorney fees, costs or other charge, claimed to be due under any provision of this Sub-title, shall be summary and shall always be tried or heard by preference, in all courts, original and appellate, whether in or out of term time, and either in open court or chambers, at such time as may be fixed by the court, which shall be not less than two nor more than ten days after notice to the defendant or opposing party.
"(2) All defenses, whether by exception or to the merits, made or intended to be made to any such claim, must be presented at one time and filed in the court of original jurisdiction prior to the time fixed for the hearing, and no court shall consider any defense unless so presented and filed. This provision shall be construed to deny to any court the right to extend the time for pleading defenses; and no continuance shall be granted by any court to any defendant except for legal grounds set forth in the Louisiana Code of Practice.
"(3) That all matters involving any such claim shall be decided within forty-eight hours after submission, whether in term time or in vacation, and whether in the court of first instance or in an appellate court; and all judgments sustaining any such claim shall be rendered and signed the same day, and shall become final and executory on the fifth calendar day after rendition. No new trial, rehearing or devolutive appeal shall be allowed. Suspensive appeals may be granted, but must be perfected within five calendar days from the rendition of the judgment by giving of bond, with good and solvent security, in a sum double that of the total amount of the judgment, including costs. Such appeals, whether to a court of appeals or to the Supreme Court, shall be made returnable in not more than fifteen calendar days from the rendition of the judgment.
"(4) Whenever the pleadings filed on behalf of the state, or on behalf of the collector, shall be accompanied by an affidavit of the collector or of one of his assistants or representatives or of the counsel or attorney filing the same, that the facts as alleged are true to the best of the affiant's knowledge or belief, all of the facts alleged in said pleadings shall be accepted as prima facie true and as constituting a prima facie case, and the burden of proof to establish anything to the contrary shall rest wholly on the defendant or opposing party."
[3] R.S. 47:1601 reads, in its entirety, as follows:

"When any taxpayer fails to pay any tax, or any portion thereof, due under the provisions of this Subtitle on or before the day when it shall be required by law to be paid, there shall be added to the amount of tax due, interest at the rate of one per centum per month from the due date until paid, except in the case of a waiver under R.S. 47:1565.1, if the tax is paid within ten days after notice of the assessment is mailed to the taxpayer, the interest shall be computed to the thirtieth day after the filing of such waiver or to the date the deficiency is paid, whichever is earlier. If the term for which interest is to be charged exceeds four years, the rate of interest for the period beyond four years shall be reduced to one-half of one per centum per month. Such interest shall be an obligation to be collected and accounted for in the same manner as if it were part of the tax due and can be enforced in a separate action or in the same action for collection of the tax, and shall not be waived or remitted." (As Amended by Acts 1970, No. 663, Sec. 1.)
[4] R.S. 47:1512 reads, in its entirety, as follows:

"The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Sub-title, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor."
[5] See Footnote, 2, supra.
[6] Joint Exhibit "A."